## SAM RIDGE v. THE STATE.

### No. 903.   Decided February 8, 1911.

**1.—Murder—Evidence—Bills of Exception—Practice on Appeal.**

Where, upon appeal from a conviction of murder, the bills of exception to the rejected testimony were not full and explicit within themselves, so that the matters presented to the court for revision could be comprehended without recourse to the statement of facts, or some other part of the record, the same could not be considered.

**2.—Same—Evidence—Date of Offense.**

Where, upon appeal from a conviction of murder, the court, notwithstanding the defective bills of exception, considered same, an objection which claimed a variance between the evidence and the allegations in the indictment charging the date of the murder on the 24th of February, 1910, and the evidence showing that it was committed on January 24, 1910, was untenable, and there was no error in admitting testimony of facts occurring before February 24, 1910.

**3.—Same—Evidence—Weight of Testimony.**

Where, upon trial of murder, the objections to the testimony with reference to finding a certain whisky bottle in the deceased's place of business were more to the weight of the testimony than to its admissibility, there was no error.

**4.—Same—Evidence—Watch.**

Where, upon trial of murder, the State relied upon certain testimony concerning a watch worn by the deceased, there was no error in admitting testimony about finding said watch, and its identity.

**5.—Same—Charge of Court—Robbery—Murder in the First Degree.**

Where, upon trial of murder, the indictment alleged that the defendant killed deceased by choking him, and in the second count by some manner and the use of some means unknown to the grand jurors, and the evidence clearly established the fact that the deceased was murdered in the perpetration of robbery—all the testimony being circumstantial—there was no error in the court's charge defining robbery to instruct the jury that if murder is committed in the perpetration of robbery, it is murder in the first degree.

**6.—Same—Sufficiency of the Evidence—Circumstantial Evidence.**

Upon trial of murder, where the evidence was sufficient to support the conviction, although entirely circumstantial, the same will not be disturbed.

Appeal from the District Court of Kaufman.   Tried below before the Hon. F. L. Hawkins.

Appeal from a conviction of murder in the first degree; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*A. U. Puckitt* and *Ed R. Bumpass,* for the appellant.—Upon the question of the insufficiency of the evidence: Henderson v. State, 14 Texas, 503.

*C. E. Lane,* Assistant Attorney-General, for the State.   (John A. Mobley, who was Assistant Attorney-General when this case was first submitted, filed a brief.)—On question that bills of exception must be full and explicit: Eldridge v. State, 12 Texas Crim. App., 208; McGlasson v. State, 38 Texas Crim. Rep., 351; Livar v. State, 26 Texas Crim. App., 115; Walker v. State, 19 Texas Crim. App., 176; Hennessy v. State, 23 Texas Crim. App., 340; Thompson v. State, 29 Texas Crim. App., 208; Tweedle v. State, id., 586; Ballinger v. State, 11 Texas Crim. App., 323; Howerton v. State, 43 S. W. Rep., 1018.

PRENDERGAST, JUDGE.—The appellant was regularly indicted for murder of Sing Lee, a Chinaman; the indictment in one count alleged, among other ways, that the appellant killed him by choking him with his hands and with the Chinaman's queue and hair, and by drawing the same around his throat, and by choking him with a rope or cord around his throat.   And in the second count, that he killed him in some way and manner and by some means, instruments and weapons to the grand jurors unknown.   The evidence was wholly circumstantial. We have carefully examined the whole of the record and several times considered the evidence and the various questions raised.

The testimony clearly and satisfactorily shows that the appellant lived in Dallas, Texas, but that some time on Saturday before the Chinaman was murdered the following Monday night, he arrived in Terrell, Kaufman County, where the Chinaman lived and conducted a laundry.   No one stayed in the laundry with the Chinaman either in the daytime or at night.   He prepared his own meals and slept in one of the back rooms of the building used by him for a laundry.   The building itself was a storehouse cut up into several rooms.   A front room, a room back of it next, and then still to the rear a smaller room where he slept, cooked and ate.   There was a hole in the back wall of the building sufficiently large for a person to go in and out which was in no way stopped up.   The front door was also left unfastened—at least in the daytime—so that persons could go in and out to leave or get their laundry without the Chinaman having to come to the front door.   By its being opened a bell was rung back where the Chinaman was so that it would attract his attention and persons could thereby call him to the front when they wanted him.

The Chinaman was last seen alive late Monday evening about his laundry. He had been seen every day from day to day for several days before then. One party went to his laundry Tuesday morning about ten o'clock, and, although he opened the front door and left his bundle to be laundered, the Chinaman did not come to the front and made no response to the ringing of the bell. This witness, however, made no inquiry, and did not undertake to find the Chinaman at that time. About the middle of the evening another party went and tried to attract him in the same way. Failing, he went back into the next room and discovered that the Chinaman's trunks were open and his clothes strewn around over the floor. He thereupon procured others, including the city marshal, and they then went back into the rear room and found the Chinaman dead on the floor. The only clothing he had on was an undershirt, a pair of pants and socks. There were several fresh bruises about his face and head and blue streaks around his neck, and his queue—a long one—was wound somewhat around his neck and the end of it lying on his body. A gash to the bone had been made on his chin. Everything in the room was shown to be torn up and his clothes and other things strewn around over the floor. His two trunks had been emptied and the clothing thrown out on the floor. His bedclothes were all torn up, some thrown out on the floor. It is clear to our minds from all of the testimony that the Chinaman was murdered in the perpetration of robbery some time during Monday night. It is also clear to us that he had been choked either by someone's hands or with his queue, and we believe with both, and was killed in that way, by choking.

The appellant stayed Saturday and Sunday nights at one negro lodging house in Terrell, but went to another Monday night. The appellant was seen and clearly identified by several witnesses at the Chinaman's laundry Saturday evening, Sunday evening and Monday evening, once in front of the laundry on the sidewalk, the other two times in the laundry talking to the Chinaman. On Saturday evening late he was seen in the laundry by a negro, one of the State's witnesses, sitting in the front room with his back toward and behind the door, talking to the Chinaman. When this witness went in it was rather dark, and he mistook appellant for someone else and spoke to him. Discovering his mistake he introduced himself, and the appellant told him his name was Sam White. This witness was in the laundry at that time to procure his bundle, and did so. He also at the same time bought some collars from the Chinaman. All this occurred in the presence of the appellant. On this occasion, while this witness was in the laundry the defendant asked the Chinaman why he didn't run a restaurant instead of a laundry. He replied that he had run a restaurant once in Texarkana, and as there was no money in it he quit it. The witness then said to the Chinaman: "Lee, you makes money enough in the laundry business to meet your obligations, doesn't you?" Whereupon the appellant said: "Gee, Lord, yes." The appel-

lant then asked the Chinaman if he kept his money there or sent it back to China. The Chinaman pointed to a calendar on the wall on which there was a picture of a bank building.

The Chinaman was shown to be in the habit of ordering whisky from time to time from the liquor house of Bruce Liquor Company of Dallas, and that he, among other times, in November and December, 1909, and on January 17, 1910, ordered two quarts of liquor known as "Dripping Springs Whisky," and that on those respective dates the Bruce Liquor Company shipped to the Chinaman at Terrell two quarts each time of this brand of whisky. A carton or box in which liquor was shipped by this company to Sing Lee was found on the floor near the dead body when his body was first discovered. This box was addressed to Sing Lee at Terrell, Texas. Lying near it was an empty quart whisky bottle with a label on it, "Dripping Springs Whisky." A few days later the city marshal went to the negro boarding house of Cilla Spencer in Terrell, searched her trunk and found therein a quart bottle of the same size and shape and label, about half full of whisky. On Monday night before the Chinaman was found dead the following evening the appellant went to this negro lodging house about night or dark and engaged a room in which to sleep that night. He asked the price and was told that it was twenty-five cents. He stated he had no money. He did not pay the price then. The next morning he paid the keeper, said Cilla Spencer, fifty cents. When he first engaged the room she asked him if he wanted then to go to bed. He replied that he did not, that he had some business to attend to, and soon thereafter left her house. He was gone for some time, returned about ten or eleven o'clock, and brought with him to this lodging house a bottle of whisky which had theretofore not been opened and was full of whisky. He asked for a paper to wrap it up. The lodging-house keeper, upon finding that it was whisky, wanted some, and the appellant opened it and gave her and some two or three others a drink out of it at that time. He then gave to the lodging-house keeper the bottle, then about half full, and she put this bottle in her trunk and locked it. She was called to Fort Worth on the early morning train the following morning on account of the sickness of her daughter, and was gone about a week. Before she returned the city marshal had gone into her trunk—found and took this bottle of whisky. The defendant himself did not drink any of the whisky that Monday night when the others did. He left Terrell Tuesday morning about daylight and went to Dallas.

After the appellant brought the bottle of whisky to the lodging house of Cilla Spencer about ten or eleven o'clock, he did not then go to bed, but soon afterwards left the lodging house again. It is not certain from the testimony how long he stayed away on this occasion, but he afterwards did return some time before or about four o'clock the next morning. When he returned on that occasion he had with him a bag or sack which he took to his room and which the witness described as having junk in it, or something that rattled or sounded like money

when he placed it down on the floor, and also sounded and made a noise like money when he took it up when he left to go to the train. The witness said it rattled and made a noise like money both when he put it down and afterwards when he took it up. She did not know what was in it—did not ask—and said nothing about it at the time. There were two trains going from Terrell to Dallas in the mornings. The first left about 5:40, the other about an hour later. When the appellant returned the last time to the lodging house on the Monday night, he wanted the housekeeper to wake him up so that he could catch the early morning train. He did not undress when he retired, but pulled off his coat; the witness thought he slept. She herself did. Upon her awakening in the early morning she discovered that the depot building was lighted up. She thereupon called to the appellant and told him the depot, which was not far away and in plain view, was lighted up, and the train would soon be there. In the house where they were it was dark; she wanted to make a light so that he could see how to dress and get out, but he prevailed upon her not to do so, and would not let her do so, although she somewhat insisted. As soon as he dressed himself he took the sack and left on that train. She left about an hour later for Fort Worth on the next train, having been called there by telegram on account of the sickness of her daughter, and did not know and had not heard that the Chinaman was dead until after her return from Fort Worth to Terrell, about a week later.

The Chinaman was shown clearly and conclusively to have had a gold watch which he sometimes wore on his person and sometimes did not. He was first shown to have had this watch about two years prior to his death. Many witnesses testified to this, and showed clearly and conclusively that he had this watch continuously from about two years before his death up to within a day or two before he was killed. This watch was produced on the trial and introduced in evidence by the State. It was clearly and unequivocally identified by the various witnesses, some not so positively, but others very positively. At once, after the discovery of the dead body of the Chinaman, his person, and soon afterwards his whole premises, were thoroughly searched, especially for a watch. None was found. The city marshal found nine or ten pennies, and he thinks one dime, scattered about on the floor near the dead body of the Chinaman. A few days after the Chinaman was killed the appellant had this watch in his possession and tried to sell it to one of the witnesses, a tailor, in Dallas, Texas, claiming that he had gotten it in Terrell. This witness declined to purchase it. His place of business was about a block and a half distant from the pawn-broker's shop of Jacob Winterman in Dallas, Texas. Shortly after he tried to sell this watch to this tailor he went to this pawn shop and pawned this watch to the pawn-broker, who advanced him three dollars on it. At the time an accurate description was made by the pawn-broker of the watch, giving a full description and whatever numbers that were necessary to identify it. It was clearly and without doubt

shown that this watch was the dead Chinaman's watch, and that it was the same pawned by the appellant and identified and introduced in evidence on the trial of this case. When the officers first tried to arrest the defendant he ran and escaped, but was apprehended and arrested about a week later.

The Chinaman was a delicate little fellow; looked like a little woman; weighed about 110 pounds, and was thirty-five to thirty-eight years old. The appellant was a big, powerful man physically, weighed about 200 pounds, was about twenty-seven years old, and prize-fighting was a part of his business.

We have not undertaken to give the testimony in full. It is quite lengthy and we have tried to give substantially such a statement of it as to show whether or not the appellant was guilty. This statement is given because the appellant attacks the sufficiency of the evidence to sustain the conviction. In our opinion it is amply sufficient.

The appellant has some ten bills of exception in the record. The Assistant Attorney-General earnestly insists that none of these bills should be considered because they do not comply with the statutes and rules of this court so that this court can consider them. It has been long and well established by the decisions of this court that bills of exception will not be considered unless they are full and explicit within themselves so that the matters presented to the court for revision may be comprehended without recourse to the statement of facts or any other part of the record to perfect or complete them, and that such bills must state enough of the evidence or facts proven to render intelligible the ruling of the court excepted to, so that this court can tell therefrom whether or not error has been committed. We deem it unnecessary to recite these authorities; they are numerous and uniform. Measured by this, it is our opinion that most of these bills, if not all of them, are not such that this court can consider them, and we will not undertake to discuss them separately. However, on account of the life sentence of the defendant, and it being a case where he was convicted on circumstantial evidence wholly, we have looked into each of the bills of exception and assignments of the appellant.

Several of the bills objected to the introduction of certain evidence of facts occurring before February 24, 1910, because of a claimed variance between the indictment which charged the murder to have been committed on February 24, 1910, the evidence establishing that it was committed on January 24, 1910. This is shown by a qualification of some of the bills by the district judge in allowing them. Of course, none of these bills are well taken on that account. Even though the indictment did charge that the murder was committed on February 24th, any relevant testimony of facts that occurred prior to the date the murder was charged in the indictment could not be inadmissible because the evidence showed that the murder was committed on January 24th instead of February 24, 1910.

Some of the bills are also objections to the introduction of the testi-

mony about the bottle of whisky and empty bottle and box found in the Chinaman's place of business. Some of the witnesses testified to some things about it, others to other things. Taken as a whole the objections were more to the weight of the testimony than to its admissibility. The qualification of the judge to these bills was such as to show that the whole testimony on the subject should be taken and the bill qualified thereby instead of taking up each separate piece of testimony by itself. This was correct, and there was no error in any of these matters.

Likewise, the same general kind of objections were made to the testimony of the various witnesses about the watch and its identity, and when and where they had seen the Chinaman have it. These objections were more to the weight than to the admissibility of this evidence. Taken as a whole, as it should be and was by the district judge, as shown by the bills, it made a complete link and chain of evidence showing that the dead Chinaman had this watch as early as two years before he was killed, and that he from time to time thereafter, and almost continuously, was seen in possession of, and had it up to within one or two days before he was killed. There was no error in admitting this testimony over the objections that were made.

Appellant's tenth ground of his motion for new trial in the court below is as follows: "The defendant excepts to paragraphs 8, 9, 10 and 11 of the charge by the court herein, and for said exceptions says that same is not warranted in this, that the said defendant was not charged with robbery, but with murder of one Sing Lee, and that the charge by the court upon robbery and as specified by the court in said paragraphs is unwarranted." We have given above in effect what the indictment charged. The evidence in our opinion clearly established that the Chinaman was murdered in the perpetration of robbery. The complaint of this charge does not point out any defect in the charge as given which is on the subject of robbery, but it seems that his complaint is that nothing should have been given on the subject of robbery at all. The charge of the court by these paragraphs objected to correctly defines robbery, and tells the jury that if murder is committed in the perpetration of robbery it is murder in the first degree; then tells them that the punishment for murder in the first degree is death or confinement in the penitentiary for life. Then in an apt charge, which is clear and full, submits to the jury, if they believe from the evidence beyond a reasonable doubt that the appellant killed the Chinaman in the manner and way charged in the indictment, and that it was done in the perpetration or attempted perpetration of robbery, and all of the other elements necessary for a conviction were submitted, that then they would find defendant guilty, and assess his punishment at death or confinement in the penitentiary for life. It is our opinion that it was essential that such charge should have been given to the jury in this case, and that there was no error therein in giving it.

We think it unnecessary to discuss specially any of the other assign-

ments of error or bills of exception. As stated above, it was unnecessary for us to have considered any of them in the state of the record, but we have done so, and it is our opinion that none of them point out any reversible error in this case.

We therefore affirm the judgment in all things.

*Affirmed.*